WHITE OAK COAL COMPANY, Plaintiff, *v.* PANAMA RAILROAD COMPANY, Defendant.*

Supreme Court, New York County, December 10, 1929.

*Bassett, Thompson & Gilpatric* [*Wilson W. Thompson* and *John L. Steinbugler* of counsel], for the plaintiff.

*Richard Reid Rogers*, for the defendant.

SHERMAN, J. The decision in the above case published in the New York Law Journal, December 4, 1929, is recalled and the following published in its place: Under the contract between the

* See, also, 132 Misc. 104.

parties defendant purchased of plaintiff 36,000 net tons of coal, deliverable in equal monthly installments of 4,000 tons over a period of nine months, beginning November 1, 1920, and ending July 31, 1921. The contract was not actually signed until November 15, 1920. Plaintiff sues for the damages alleged to have accrued because of defendant's failure to take and pay for the undelivered coal, aggregating 14,333.69 net tons, at the agreed price of $4.90 per ton.

At the outset the meaning to be given to an important part of the contract as to which the parties differ must be determined. Plaintiff claims that the duty of actually ordering the coal from the mine in West Virginia rested upon defendant as a prerequisite to shipment on its part, while defendant asserts that the initiative of tendering the coal was upon plaintiff. By the phrasing of the contract, plaintiff agreed " to sell " and " ship from the mines in the New River district, West Virginia," coal at the above-mentioned price, " per net ton f. o. b. mines, delivery (approximately) 4,000 tons per month to be shipped to, as ordered, Newport News or Sewall's Point, at seller's option. Destination Newport News and/or Sewall's Point, Va." During the month of January, 1921, defendant requested that all further shipments should go forward over the Virginian railroad. This was agreed to and thereafter all coal had to be sent to Sewall's Point, which was the tidewater terminal of that railroad. Defendant ordered no shipments, nor under a proper construction of the contract was it its duty so to do. Plaintiff, however, commenced to ship the coal promptly upon the signing of the contract, and thereafter shipments went forward from the mines to tidewater, where the coal was loaded by machinery directly from the cars into defendant's vessels for use or transportation to the Panama Canal Zone. At that time the Sewall's Point Coal Exchange, Inc., was in operation, whereby all cars of coal were necessarily consigned to that exchange for the account of the purchaser. Both plaintiff and defendant were members of the Sewall's Point Exchange and had agreed to be bound by its by-laws and regulations. The practice was that after the coal had been loaded upon railroad cars at the mine plaintiff would notify both defendant and the exchange of such shipment and the exchange upon the receipt of such report credited defendant with the quantity of coal contained in the shipment and mailed a report to defendant of the extension of such credit. Defendant was then at liberty to take from the accumulated cars at Sewall's Point the amount of coal to which it was entitled upon giving notification of the expected arrival of the ship at the Sewall's Point hoist. The car was hoisted and its contents dumped into the vessel after being weighed, and defendant thereupon paid charges for transportation from the mine;

defendant's account with the exchange was then debited with the amount of coal so received, proper adjustments being made for difference in weight.

It will be seen that under this practice, where hundreds of cars of coal were in transit upon the railroad or at the terminal yards, defendant would rarely, if ever, actually receive the specific car which when loaded at the mine was intended for its use. This method of handling the coal shipments between the West Virginia mines and seaboard was the outgrowth of the regulations enforced by the Federal government during the war and was devised for the purpose of avoiding the necessity of tracing, handling and switching a particular car where all of the coal was of a like grade. To have done otherwise would have entailed a considerable loss of time and an unnecessary expenditure of labor to bring a particular car of coal at a specified time alongside a designated vessel.

On March 8, 1921, defendant caused an embargo to be placed against rail shipments of coal from plaintiff's mines to seaboard in fulfillment of this contract. It would have been a futile thing for plaintiff to have attempted thereafter to make any deliveries under this contract. This embargo has never been raised. Its existence excused plaintiff from making any tender and also gives plaintiff a right of action against defendant for damages for the undelivered coal throughout the balance of the contract period.

Defendant, however, contends that inasmuch as plaintiff was possessed of credits in the Sewall's Point Exchange it should have tendered such credits to defendant, and that if such tender had been made defendant would have accepted the coal at seaboard. This contention is of no avail to defendant, inasmuch as under the contract plaintiff was not required so to do. Its engagement was to ship the coal from the mines, and when defendant prevented performance by invoking an embargo it broke the contract. Clearly it was no part of the plaintiff's duty to save defendant harmless from the consequences of its own conduct.

Defendant seeks to reduce plaintiff's claim by asserting that on May 1, 1921, a marine strike took place which " unavoidably stopped the works of the buyer " within the language of one of the conditions of the contract; that this strike continued unabated for about six weeks, and that accordingly, even had no embargo been placed, plaintiff's right to ship during that period would have been suspended. The difficulty, however, with defendant's position is that even if the strike had unavoidably stopped the works of the buyer the express language of the contract gave the purchaser the right to suspend deliveries only upon written or telegraphic notice to the seller. Concededly, no such notice was ever given. Nor

for that matter is the proof convincing that the works of the defendant had been unavoidably stopped. Defendant maintained a fleet of colliers which carried coal from Hampton Roads to the Panama canal, where it was stored, used and sold. Coal-carrying vessels were available for charter. The strike did not cause a cessation of defendant's works. Defendant apparently did not regard it as being effective, because it failed to give the written notice required by the contract as a prerequisite to the exercise of its right to a suspension of deliveries.

The mere fact that the vice-president of the defendant mentioned over the telephone the existence of the strike to the plaintiff's sales agent does not give rise to any waiver on the part of the plaintiff of this definite requirement of the contract. Defendant's contention in this regard must fail. The subsequent tender to defendant and its acceptance in August, 1921 (after the contract period had terminated), of 3,152.80 tons, constituted no accord and satisfaction, but was merely a belated performance of part of the contract. The proof shows the following deliveries: In November, 1920, 3,171.38 net tons; in December, 1920, 5,257.11 net tons; in January, 1921, 5,969.52 net tons; in February, 1921, 3,830.15 net tons; in March, 1921, 285.35 net tons; in August, 1921, 3,152.80 net tons. This would leave a deficiency of 14,333.69 net tons. However, during the month of November, 1920, plaintiff failed to deliver 828.62 net tons and during February, 169.85 net tons, making a deficiency of 998.47 on its part. The quantity of coal to be used in figuring plaintiff's damages must be diminished by that sum, so that upon the cause of action set forth in the complaint plaintiff is entitled to compensation for the failure of defendant to accept 13,335.22 net tons of coal. In December defendant accepted 1,257.11 net tons in excess of the contract requirement for that month; in January 1,969.52 tons in excess of the contract installment. In August, 1921, it took 3,152.80 net tons on account of the total balance of undelivered coal, which together with the December and January excess shipments must be allocated to the early deficiencies occasioned by defendant's default. Plaintiff's damages, to be computed with monthly rests, are fixed, after proper allocation, as follows: For April, 1921, upon the undelivered tonnage of 1,335.22 net tons, amounting to $2,917.45; for May, 1921, upon the 4,000 tons undelivered, $6,960; for June, 1921, upon the 4,000 tons undelivered, $8,740; for July, 1921, upon the undelivered 4,000 tons, $9,610; making in all the sum of $28,227.45, to which interest must be added. The remaining question relates to the counterclaim pleaded by defendant. That counterclaim appears to be limited to damages for failure to make a full shipment

during the month of November, 1920. Defendant is entitled to succeed upon that issue.

Accordingly, plaintiff's recovery must be diminished by the amount of damage sustained by defendant upon 828.62 net tons of coal which plaintiff failed to ship during November, defendant having been required to purchase in the outside market coal at an advance of sixty cents per net ton. Defendant pleaded its loss at sixty cents per net ton in the 13th paragraph of its answer and the damages are awarded at that rate, amounting to $497.17.

Accordingly, the motions for judgment are disposed of as follows: In favor of plaintiff and against defendant for the sum of $28,227.45, with interest; in favor of defendant and against plaintiff upon the counterclaim and for the sum of $497.17, with interest.

The proposed findings of fact cannot be effectively passed upon, since they do not follow the views here expressed. New findings of fact will be required in conformity with the above determination.